## EASTERN TUBE CO. v. HARRISON.

(Circuit Court, E. D. Pennsylvania. September 6, 1905.)

### No. 20.

1. CONTRACTS—BOND SUBSCRIPTIONS—UNDERWRITING AGREEMENT.

The fact that the owner of a large amount of stock of a corporation obligated itself, in a syndicate agreement for the underwriting of an issue of the company's bonds, to deliver to purchasers of such bonds a proportionate amount of the company's stock as an inducement to facilitate their sale, did not disqualify such owner from itself becoming a subscriber to the underwriting agreement; and hence its subscription did not invalidate such agreement, nor relieve the other subscribers for liability.

2. SAME—LIABILITY OF SUBSCRIBER TO ASSIGNEE.

Defendant, as one of a syndicate, signed an underwriting agreement by which the subscribers agreed to take and pay for an issue of bonds of a corporation to provide it with additional working capital, and for the purpose of obtaining the money at once, while giving the syndicate time to sell the bonds to the public before being required to pay for them, it was provided that the subscribers should not be required to take the bonds for more than a year, but that the company might assign their subscription as security for money borrowed, and that the assignee should be subrogated to all of its rights thereunder. The subscription was pledged as security for a loan, as contemplated by such provision. *Held*, that the right of the assignee to enforce the contract against a subscriber was not affected by the fact that the company became insolvent before the subscription was payable.

3. SAME—RIGHT OF SET-OFF.

Where a syndicate agreement for the underwriting of an issue of bonds of a corporation was assigned by the company as collateral security for a loan, as was intended and expressly permitted by its terms, a subscriber, when sued thereon by the assignee, cannot set off equities existing between him and the company, and arising after the contract was executed and assigned.

At Law. On motion for judgment on point reserved.

Simpson & Brown, for plaintiff.
John Hampton Barnes, for defendant.

HOLLAND, District Judge. The Trust Company in this case, as signee of the subscription agreement of an underwriting syndicate to bonds of the Tube Company, brings suit against the defendant, one

of the subscribers to these bonds, to recover the sum of $13,000, with interest thereon from December 15, 1903, less a credit of $1,950 as of June 20, 1904. At the trial it appeared that on November 30, 1901, the defendant, with others, executed and delivered an agreement between the Eastern Tube Company, a corporation of the state of West Virginia, hereinafter designated as the "Tube Company," the Waterworks Construction Company, a corporation of the state of New Jersey, hereinafter called the "Construction Company," Turner A. Beall, of the borough of Manhattan, in the city of New York, hereinafter called the "fiscal agent," and the several signers, hereinafter called the "subscribers." The agreement sets forth that the Tube Company had created a mortgage to secure the issue of $1,000,000 6 per cent. 25 year sinking fund gold bonds, of which there had been $750,000 issued, leaving in the treasury of the Tube Company $250,000 of said bonds, which it was proposed to issue, pursuant to the terms of said mortgage, "for the purpose of supplying the said company with additional working capital," and for this purpose each of the subscribers, "for himself and not for any of the others," agreed with each other, and separately with the Tube Company and the Construction Company, to subscribe to such bonds "to the extent set opposite their respective signatures thereto," and each one "agrees to purchase the same, and pay therefor, at par, at the time and in the manner and under the conditions" set forth in the agreement, as follows:

"(1) This subscription shall become binding only when bonds equaling $250,000 par value shall have been subscribed for.

"(2) Payment for the said bonds shall be made on the 2d day of January, 1903.

"(3) The Construction Company, being a considerable holder of the securities of the Tube Company, and largely interested in its success, does agree, in consideration of said subscriptions, to deliver to each of the subscribers, upon payment being made, an amount of the 7 per cent. cumulative preferred stock of the said Tube Company equaling 25 per cent. and an amount of the common stock of the said Tube Company equaling 75 per cent. of the par of such subscription.

"(4) The fiscal agent shall have the right, subject to the provision of paragraph 6 hereof, and is hereby authorized, at any time prior to 90 days before the date named for such payment, to sell at private sale any or all of said bonds at par, for account of the subscribers, accompanied by stock in an amount not to exceed of preferred stock 12½ per cent. and of common stock 37½ per cent. of the par value of the bonds so sold; and the remainder of the stock, provided by paragraph 3 to accompany said bonds, shall be divided among the subscribers proportionately to the amount of their underwritings.

"(5) Should the said bonds, or all of them, not have been sold by said fiscal agent prior to the 2d day of October, 1902, there shall be issued, without expense to the subscribers hereto, in good form and manner, by publication or otherwise, a prospectus, dated New York, offering for public subscription the said bonds (or so many of them as shall not have been previously sold), accompanied by not to exceed 12½ per cent. in preferred stock and 37½ per cent., in common stock of the par value of bonds so offered. Said prospectus to be published at least three successive days, unless subscription should be sooner filled, in at least two daily newspapers in each of the cities of Philadelphia, New York, and Pittsburg. If all the bonds offered by such prospectus shall be taken by outside subscriptions, and paid for, or subscribed for by responsible parties satisfactory to the fiscal agent, within 10 days after the first publication of said prospectus, the subscribers shall not be required to take up any of the said bonds by us underwritten. If any of the bonds offered as aforesaid are not taken and paid for, or subscribed for by responsible

outside parties satisfactory to the fiscal agent, within 10 days after the first publication of prospectus, the subscribers will, on the 2d day of January, 1903, take and pay for at par such proportion of such remaining bonds as the amount of bonds underwritten by us bears to the total amount of bonds offered by the prospectus.

"(6) The right is reserved to any subscriber hereto, at any time prior to the public offering above referred to, to withdraw his bonds from such offering by written notice to the fiscal agent, and payment therefor, at par and accrued interest; and in case of such withdrawal and payment the subscriber shall receive his bonds and the accompanying stock, and shall agree not to offer the same for sale prior to January 2, 1903.

"(7) The subscribers' consent to the assignment of this contract by the Tube Company to any financial institution or institutions as collateral security for a loan of money, not exceeding the amount of the par value of said bonds, at any time before the 2d day of January, 1903, and in the event of such assignment, such financial institution shall be subrogated to all the rights of the Tube Company under and pursuant to this agreement.

"(8) Deliveries and payments at the office of the Tube Company, Room 304 Standard Oil Building, New York City."

The defendant in this case became a member of this underwriting syndicate, and subscribed for $25,000 of these bonds; and this amount, with other subscriptions made by parties not otherwise interested in this agreement, made a total of $250,000, the sum required to be subscribed before the agreement was to be considered binding, in accordance with condition No. 1 above set forth. In addition to this sum, taken by those not party to the agreement, the Construction Company subscribed for $20,000 of the bonds. Ten days after the execution and delivery of this subscription agreement, to wit, December 10, 1901, the Tube Company borrowed of the Mercantile Trust & Safe Deposit Company of Baltimore, hereinafter called the "Trust Company," the sum of $200,000, and assigned the subscription agreement as collateral security for the payment of a note executed to the Trust Company for that amount, payable in one year from that date. When this indebtedness became due, the Trust Company declined to renew the note for the full amount, but agreed to renew it for $100,000, upon being duly secured. In the meantime, however, R. G. Gillespie, who had subscribed to the original agreement for $25,000 of the bonds, and V. Q. Hickman, subscriber in said agreement to the amount of $15,000, making a total of $40,000, had assigned their interest in the subscription to the Construction Company to the extent of $20,000, and the remaining $20,000 was equally divided and assigned to James E. Samuel and J. B. Samuel, each for $10,000, and for the purpose of obtaining a renewal of the loan from the Trust Company in the sum of $100,000 these parties, together with the original subscribers, excepting their vendors of the subscription, duly executed and delivered to the Eastern Tube Company a supplemental underwriting agreement, in which it was agreed as follows:

"Whereas, the subscribers hereto did, by an instrument in writing dated the 30th day of November, 1901, agree with the party of the first part to purchase bonds of the Eastern Tube Company in a total amount of $250,000, in the respective proportions and on the terms as by reference to said underwriting agreement will more fully appear; and

"Whereas, by the terms of said underwriting agreement it was provided that, if the said bonds were not sold for account of the underwriters prior to October 2, 1902, they should be offered for public subscription, and in the

event of any of the said bonds not being subscribed, taken, and paid for by responsible purchasers within 10 days · after the first publication of the prospectus making such public offering, the subscribers would, on the 2d day of January, 1903, take and pay for, at par, such a proportion of such remaining bonds as the amount of bonds underwritten by them should bear to the total amount of bonds offered by the prospectus; and

"Whereas, it has been determined, because of the present high rates for money, and for other reasons, that it is inexpedient to make such public offering at this time:

"Now, in consideration of the sum of $1.00, in hand paid by the party of the first part to each of the subscribers hereto, the receipt of which is hereby acknowledged, and of other good and valuable consideration, it is mutually covenanted and agreed:

"First. That the said underwriting agreement of November 30, 1901, be, and the same is hereby, modified to provide that such public offering shall be deferred to a date to be fixed by the party of the first part, not later than October 15, 1903, and shall then be made in the manner provided by said underwriting agreement, and that such of said bonds as are not subscribed, taken, and paid for on such public offering shall ·be paid for by the subscribers hereto on the 15th day of December, 1903, instead of the 2d day of January, 1903, save and except that each subscriber hereto and to said agreement of November 30, 1901, in consideration of the above-mentioned extension, hereby agrees to take up 50 per cent. of the amount of bonds heretofore underwritten by him, and to pay for the same at par and accrued interest on or before the 15th day of December, 1902. All checks to be payable in New York funds to the Eastern Tube Company at its office in New York. For such payments the subscribers shall receive bonds of the Eastern Tube Company at par, with 25 per cent. in preferred stock and 75 per cent. in common stock of the amount of such payments. In addition to the above-mentioned payment of 50 per cent., each subscriber hereto agrees to pay such sum as will entitle him to a full $1,000 bond and accompanying stock, in cases where an even payment of 50 per cent. would involve the delivery of a fractional part of a bond.

"Second. And it is mutually covenanted and agreed that the said underwriting agreement of November 30, 1901, shall be and continue in full force and effect as to all the provisions thereof not herein specifically mentioned."

This supplemental agreement was duly executed and delivered to the Trust Company, together with $125,000 Eastern Tube Company first mortgage 6 per cent. bonds, and with 325 shares of preferred stock and 975 shares of common stock of the said Tube Company, as collateral security for the payment of a renewal note, dated December 8, 1902, for $100,000. This note provided for the sale of the collateral in case of default. on the note, and authority for the Trust Company to purchase this collateral at its own sale, which subsequently occurred. The bonds were offered at public sale at the time and in the manner set forth in the agreement, and all other preliminary conditions were observed by the Trust Company, down to the time suit was brought against the defendant. The defendant, Thomas Skelton Harrison, knew the underwriting agreement had been assigned by the Tube Company as collateral for a loan shortly after it had been done, but he was not informed of the name of the assignee. He also knew that the supplemental underwriting agreement was assigned, together with the original agreement and the bonds and stock of the Tube Company, as collateral security for a renewal of part of the loan, although he was not even then cognizant as to the name of the assignee, and he stated that it was for the purpose of borrowing money that the subscription agreement was created. The Trust Company never did anything to relieve either Gillespie or Hick-

man of their liability, whatever that may be, on their original agreement. The defendant, at the time the supplemental agreement was assigned to the Trust Company as collateral security, was not aware of the fact that Gillespie and Hickman had assigned their claim to other parties. At the time of the execution of the supplemental agreement, the assignment of the same to the Trust Company, and the execution and assignment of the bonds and stock of the Tube Company, with said supplemental agreement as collateral security, there was no evidence to show that the Tube Company was other than solvent. Subsequently, however, on August 12, 1903, a bill in equity for the foreclosure of the mortgage against the Tube Company was instituted, and on December 1st the Tube Company filed an answer admitting its insolvency. This was 15 days before the time when the subscriptions to the bonds were payable, and on February 12, 1904, a decree was entered ordering a sale in the Circuit Court of the United States for the Southern District of Ohio, which was subsequently had, and on May 13, 1904, there was a distribution of the proceeds of this sale. There is no claim that either James E. Samuel, J. B. Samuel, or the Construction Company has failed to comply with the agreement, or that any sum for which either may be liable cannot be collected. It seems to be conceded all are responsible parties.

At the trial a verdict was taken for plaintiff by agreement for $13,000 (being one-half of the $25,000 plus the fractional part of a bond), with interest, less the payment of $1,950 received by the plaintiff; a point being reserved, viz.:

"Whether or not, upon all the evidence produced, the plaintiff is entitled to recover, with also leave to the court to reduce the verdict by the sum of $500 or $1,000, with interest from December 15, 1903, if upon their construction of the supplemental agreement it shall be of opinion that the plaintiff could in no way recover more than either $12,000 or $12,500, with interest, less the credit allowed."

The defenses urged against judgment in favor of the plaintiff are:

First. That, without the knowledge of the defendant, Hickman and Gillespie assigned their interest in the subscription agreement to the Construction Company to the amount of $25,000, thereby reducing the amount subscribed below $250,000, the amount necessary in order that the agreement should go into effect, as the Construction Company was both obligor and obligee, and therefore could not become a valid subscriber, in consequence of which the defendant was released from the obligations of his subscription.

Under the facts in this case we do not see that this is a valid reason why the Construction Company cannot become a subscriber to these bonds. The fact that the Construction Company was the owner of a great number of preferred and common shares of the Tube Company stock, and, as recited in the agreement, was "largely interested in its success," and, in order to induce others to subscribe to the bonds, offered a bonus of preferred and common stock, can in no way destroy its right to join the other subscribers in creating an underwriting syndicate to take the bonds. There was no such an obligation on its part as an obligor in the agreement as to prevent

them from becoming subscribers, because the agreement was for the purchase of the Tube Company bonds, in which transaction it was obligee alone, and the contribution of preferred and common stock by the Construction Company was a mere bonus paid by way of an inducement. The Tube Company was the obligor of the main object of the agreement, while it may be said that the Construction Company was the obligor of a mere incident in order to make the primary object of the bargain more attractive. As between this plaintiff and defendant it was only obligor, and, in any event, the defendant could only complain in case the Construction Company failed to pay for its bonds, and in this case there is no claim that the Construction Company has not responded or will not pay for all the bonds for which it is liable under the contract.

The defendant seeks to escape liability on the mere technical objection that the Construction Company could raise the question of its liability on the ground of its being obligee as to the purchase of bonds, and incidently obligor for the delivery of stock in a suit on the agreement against it. The cases which hold that a man cannot be under an obligation to himself, or even to himself in conjunction with others, have nothing in them that would indicate that the Construction Company could not be a valid subscriber, simply because it offered to contribute stock owned by it by way of an inducement to others to become subscribers to the bonds with which the real obligor had nothing to do. So long as there was $250,000 subscribed for in the original agreement, we cannot see how the defendant can in the least be injured, as there is nothing to show that the substituted subscribers are not entirely responsible for any liability to which they may be subject under the agreement, and, aside from this, it is to be noted that the liability is several, and the defendant liable only for his own subscription. His liability was neither increased nor diminished by the change of names of the two subscribers.

Second. The defendant is relieved from the purchase of the bonds under the subscription by reason of the insolvency of the corporation.

It was said in Kauffman v. Reeder, 108 Fed. 171, 47 C. C. A. 278, 54 L. R. A. 247, that:

"The situation of the parties when a contract is made, its subject-matter, and the purpose of its execution, are always material to determine the intention of the parties and the meaning of the terms they used, and when these are ascertained they must prevail over the dry words of the agreement."

This subscription agreement was entered into "for the purpose of supplying the Tube Company with additional working capital," and a syndicate of capitalists became what is know as the "underwriters" for this amount, and they created a subscription contract with this Tube Company for the very purpose of enabling the Tube Company to assign their individual liability on that subscription contract to some institution, for the purpose of borrowing money upon it in order to relieve these subscribers from taking these bonds immediately and enabling them to sell them to the public. These subscribers were being paid for the use of their names for this purpose, as the contract provided that they were to receive a certain number of shares of preferred and common stock without putting up a dollar, in case these

bonds could be sold to the public, and they were only to take in the event of the public failing to purchase, and then each was to have additional stock. In other words it was a method by which these subscribers, for a consideration, loaned their credit to the Tube Company, upon which a loan was hypothecated, and for which they were to be liable, with the additional proviso to buy certain securities at their face value, in case the Tube Company failed to repay the loan; and this was to be done regardless of the value of these securities at the time they could be called upon to pay. It was not the ordinary case of a subscription to bonds of a corporation, when the subscriber is called upon by the corporation issuing the bonds to take in accordance with a contract and the subscriber can show that the corporation in the meantime has become insolvent. In that case, of course, the subscriber would be relieved, as the corporation impliedly agrees to furnish a bond, backed by its solvency, and the subscriber would otherwise be relieved; but when the subscriber, with others, as in this case, creates a subscription not to be held by the corporation until the subscriber is required to accept the bonds, but for the very purpose of enabling the corporation to assign the liability of the subscriber to purchase the bonds at a certain figure, at a certain time, under certain conditions, as collateral security for a loan, and expressly writes into his subscription an agreement that the subscription shall be assigned in accordance with the purpose of its creation, he is liable to the assignee of the Tube Company under the conditions of the agreement for the purchase of the bonds at the amounts and times specified, regardless of the question as to what they are worth. This case is somewhat analogous to the case of Kauffman v. Reeder, 108 Fed. 171, 47 C. C. A. 278, 54 L. R. A. 247.

It was said in Kirkpatrick v. Export Co. (C. C.) 135 Fed. 147, that:

"Commercial contracts must be interpreted in the light of commercial usages, and their performance must be such as business men would naturally contemplate."

It would be manifestly inequitable to permit this underwriting syndicate for a consideration to inject into the commercial world a chose in action, the value of which was based upon their personal credit, and after it had been transferred as collateral, in accordance with the object of its creation, to permit them to so construe its terms as to get all the benefits without assuming the liabilities.

Third. The defendant, being the owner of $50,000 worth of the bonds previously issued by the Tube Company, has a right of set-off of his loss on those other bonds against the claim in this case.

This claim cannot be allowed. The subscribers, in their agreement, "consent to the assignment of this contract by the Tube Company to any financial institution or institutions as collateral security, not exceeding the amount of the par value of the bonds, at any time before the 2d day of January, 1903, and in the event of such assignment such financial institution shall be subrogated to all the rights of the Tube Company under the provision to this agreement." So that the Trust Company in this case is subrogated to the rights of the Tube Company under the agreement, and this must be construed to mean the

"rights of the Tube Company" at the time the assignment was made, because it would be improbable that financial institutions, or any one else with money to loan, would loan it upon such unreliable security as a nonnegotiable instrument, liable to the set-off of any equities between the original obligor and obligee which might arise between them in the future, and it is unbelievable that any of the parties to this contract intended to put such a construction upon it. Their undoubted intention was to make this subscription contract a valid and substantial security for a loan, upon which the lender could rely to recover in case of default on part of the Tube Company, and the language itself, together with the whole agreement, indicates that the rights to which the plaintiff is subrogated were the rights existing at the time of the assignment. The defendant knew that his liability on the original and supplemental agreements had been assigned long before any rights of set-off accrued to him, and stated that both had been created for this very purpose. With full knowledge of the whole transaction, and it having been executed and carried out in the matter of the loans in accordance with the defendant's intention, desire, and for his benefit long before he had any claim of set-off, he is not now entitled to make that claim. Henniss v. Page, 3 Whart. 275; Russell v. Church, 65 Pa. 9; Tagg v. Bowman, 99 Pa. 376; Tagg v. Bowman, 108 Pa. 273, 56 Am. Rep. 204; Ardesco Oil Co. v. Oil Mining Co., 66 Pa. 375; Woolsey v. Axton, 192 Pa. 526, 43 Atl. 1029.

The cases cited by the defendant's counsel to support the right of set-off are all to the effect that a right of set-off, accruing after notice of an assignment of a nonnegotionable instrument, cannot be used as a set-off. 25 Am. & Eng. Ency. of Law, 529; Rider v. Johnson, 20 Pa. 190; Thompson v. McClelland, 29 Pa. 475; Jordan v. Sharlock, 84 Pa. 366, 24 Am. Rep. 198.

Fourth. At most, the claim in this case should be for $12,000, with interest from December 15, 1903, less a credit of $1,950 as of June 20, 1904.

In this we are of the opinion that the defendant is right. The supplemental agreement required the defendant to take up 50 per cent. of his $25,000 subscribed on the 15th day of December, 1902, which was done by him, and in connection with that purchase of bonds, he agreed "to pay such sum as would entitle him to a full $1,000 bond * * * in case where an even payment of 50 per cent. would involve a delivery of a fractional part of a bond," and the defendant took and paid for $13,000 worth of bonds at that time. This clause had no reference to his liability to the Trust Company, and therefore he is only liable to the Trust Company for $12,000, with interest, as above claimed, from December 15, 1903, less $1,950 as of June 20, 1904, making a total judgment of $10,907.43.

For the reasons herein stated, judgment will be entered in this case on the point reserved in favor of the Eastern Tube Company, to the use of the Mercantile Trust & Deposit Company, of Baltimore, and against Thomas Skelton Harrison, for the sum of $10,907.43.